## IVEY *v.* STATE.

In Banc. May 23, 1949.

(40 So. (2d) 609)

Sandy R. King and Calvin R. King, for appellant.

738

John M. Kuykendall, Jr., for appellee.

**Roberds, J.**

Appellant was convicted of the robbery of one Ledbetter by exhibition of a pistol and sentenced to the state penitentiary for twelve years.

On this appeal he urges (1) that the trial court should have granted to him a peremptory instruction, or, if not, should have awarded a new trial, because the verdict of the jury was against the great weight of the evidence; (2) that certain evidence was incompetent and was wrongfully admitted before the jury, and (3) the district attorney, in his argument to the jury, used language not justified and which was prejudicial to him.

The first two contentions we consider together. They require a summary of the evidence. Ledbetter lived at Anniston, Alabama. He was associated with, or in the employ of one Kilgore, who was then engaged, on a large scale, in the illegal sale of whisky in Alabama, but who was out of business at the time of the trial. Ledbetter had been sentenced to the Alabama Penitentiary for violation of its whisky laws, but was then on probation. Kilgore gave to Ledbetter money with which to purchase whisky. On Saturday, June 26, 1948, Ledbetter made a trip to Louisiana. That day he purchased forty cases of whisky at a place called Yellowhammer or Sonheimer, Louisiana, from a man whose name he could not remember. The whisky was loaded into the Ledbetter automobile about midnight. Ledbetter then proceeded towards Vicksburg, Mississippi, but, being weary, departed from the highway into nearby woods and slept for awhile in his car. He then drove on through Vicksburg into Mississippi on highway 80. Shortly after he had passed the town of Bolton, Mississippi, in Hinds County, and about an hour after sunup, Ivey and another party, driving fast and sounding a siren on their car, overtook and crowded him to the side of the road and commanded that he "pull over". He did that. Ledbetter thought they were officers. Ivey had a pistol in his hand; got into the

automobile of Ledbetter, and, at the point of the pistol, made him drive from the road into the woods, the other party driving the Ivey car. At this time and place, Ivey, by exhibition of the pistol, made Ledbetter help transfer the whisky from the Ledbetter to the Ivey automobile, and robbed Ledbetter of $360.00 in cash. In the meantime, however, while the whisky was being transferred, Ledbetter had succeeded in getting the tag number of, and impressing on his mind the model, make, and color of the Ivey automobile. He remembered it was a 1946 Chevrolet, its color, and that it had a windshield wiper on the rear window, seemingly not a usual equipment for automobiles. Ivey and his companion drove away. Ledbetter proceeded a few miles towards Jackson, Mississippi, stopped and got some breakfast.

This, it appeared, was an opportune time and occasion for meditation upon recent events and contemplation as to future action. He decided to go to Durant, Mississippi, by way of Vicksburg and Yazoo City. It appears later in his evidence that the reason that thought came to him was he had heard that some three weeks previously the same automobile in which he was riding but being driven by another person, had been "hijacked" near Durant, and that his experience that morning might have some connection with that fact. The foregoing facts are based upon Ledbetter's testimony. Witness Sims, city marshall of Kosciusko, Mississippi, also testified he received information of the former hijacking incident. When Ledbetter got to Durant, armed with the car tag number, he asked Markus Rogers, a taxi driver, where he could find "the law." Ledbetter contacted a policeman at Durant, told him he had been robbed, showed him the tag number, and the policeman told him the county in which he thought that number had been issued. Ledbetter started from Durant toward Kosciusko, some twenty miles east. As he left Durant, he met another man driving a Chrysler Town and Country automobile with panelled sides. He recognized the driver of the Chrysler car

as the man from whom he had bought the whisky in Louisiana. He immediately reversed his course and began to chase the Chrysler in an effort to overtake it and interview the driver. However, the driver, apparently being well aware of Ledbetter's efforts and intentions, "stepped on the gas" and a race occurred between the two automobiles, until the driver of the Chrysler, seemingly familiar with the surrounding terrain, proceeded to drive onto a gravel road outside Durant, thereby blinding Ledbetter with dirt and dust, which put an end to the chase. Rogers, the taxi driver, of whom Ledbetter had inquired the whereabouts of the law, placed on the stand as a witness for the defendant, verified the foregoing facts. He described the Chrysler car, but did not see the driver thereof sufficiently well to identify him if he in fact knew him, but he did recognize Ledbetter as the man trying to catch the Chrysler. Ledbetter then proceeded to Kosciusko, the county seat of the county he understood had issued the car tag. He went to the city hall. That was about ten o'clock Sunday morning. There he consulted the city police, notifying them he had been robbed of the $360 and inquiring to whom had been issued the car tag number he had written down. He also described to them in detail the car used in the robbery. He gave the make, model, color, the fact it had a siren and a rear-view window wiper attached. Inquiry by the city police of the county tax assessor disclosed that the tag number had been issued to Ivey. In fact, some of the police said they knew Ivey's car had a siren and a rear-view wiper attached, these accessories being unusual. A city policeman proceeded to drive about town in an effort to locate this car. He found it standing in front of a barber shop. However, a son of Ivey's was driving it. The police then called Ivey to come to the city hall. This he did. When Ledbetter saw him, he immediately said that was the man who had robbed him. Ivey denied that. He said it might have been his car, but that he was not the guilty man. However, Ivey and Ledbetter proceeded to the rear, or

another part, of the city hall, and in this private interview Ledbetter demanded that Ivey return his money. Ivey agreed to do that. However, he had to go to his home, which was located in the outskirts of Kosciusko, to get it. He told Ledbetter to get in the car, but Ledbetter refused to do that. A city policeman then drove Ivey to his home, where he got the money, returned to the city hall, and there, in the presence of Miller, a city policeman, Sims, city marshall, and Black, a justice of the peace, he counted out and delivered the money to Ledbetter. Miller and Zachery, city policemen and Sims city marshal, and Braswell, deputy sheriff, all testified, and substantiated the foregoing facts as having occurred in Kosciusko.

We might here state, before proceeding with events, that Ivey was a constable and a deputy sheriff.

Ledbetter also said that he asked Ivey about Kilgore's whisky, and that Ivey gave him to understand he would return that. Ivey said he did not so agree.

Ledbetter then left for Anniston. The next day he and Kilgore and Kilgore's brother showed up in Kosciusko. There was no secrecy connected with their presence in that city The police knew they were there. They went out to Ivey's home; had an interview with him, and Kilgore demanded Ivey deliver up the whisky or pay a certain sum for it. They testified that Ivey told them to return in about two hours. They waited three hours and returned, when they were informed by Mrs. Ivey that Ivey had gone to Arkansas. He did go to Arkansas and remained some three weeks. The return by Ledbetter and the Kilgores to Kosciusko was Monday, June 28, 1948. As to the events occurring at the Ivey home, the wife of defendant and John Ed Ivey, Jr., a son, also testified. The son said Ledbetter and the two Kilgores came to his father's home about two o'clock the afternoon of Monday, June 28, 1948. They told Ivey they wanted $3450 pay for the whisky and they would give him two hours within which to produce the money. The

son said to them, ''I thought he had paid for the whisky,'' but they said 'he had not paid for it; that they had a shotgun in the back of the automobile; that they left and came back around four o'clock and his father had gone to Arkansas; that his father had said to them ''I will see about it for you.'' Mrs. Ivey testified she was not at home when the Kilgores and Ledbetter came to her home the first time; she was there the second visit; heard them say they would get the money or get Ivey. She also testified she was at home Sunday morning when Ivey came there and got the $360 'he later paid to Ledbetter at the city hall.

This son also testified that on Saturday night his father drove him home from uptown; that they went to the ice-box for something to eat, and the cupboard was bare; that his father had left about eleven o'clock and said he was going to town to get a sandwich; that his father came back to the home about five o'clock the next morning and was ''pretty well lit.'' He and his mother put him to bed.

Mrs. Ivey said substantially the same thing, adding that her husband, when he returned in the morning, was drunk.

Ivey testified. He admitted repaying the money, but said he did so because he was afraid. He said he did not commit the robbery. He endeavored to establish an alibi. He said after he left his home to go into Kosciusko and get a sandwich, that he went some three miles out of the city on highway 12 to a place known as the Chicken Shack. There he got his sandwich. He said there was a woman present desiring a ride to Vaiden, Mississippi, a distance of some thirty-eight miles; that he consented to transport her in his car; he and the lady proceeded toward Durant but before reaching that city they stopped at McBride's place, a short distance east of Durant; there they got sandwiches; defendant drank beer. He said he had been drinking whisky, says he and his woman companion left McBride's about 12:30 proceeded through

Durant without stopping; then went north on U. S. Highway 51 to Riley's Tourist Court, a short distance south of Vaiden. Here he says he put the lady friend out, and, so far as the evidence discloses, she disappeared into the night. He drank some more beer at Riley's. He tried to get a cabin but there was no vacancy, so he slept in his car. He left Riley's before daylight, retraced his tracks through Durant to McBride's, where he had some more beer. From there he proceeded back to his home at Kosciusko, arriving there after daylight, practically in an intoxicated condition, according to his own testimony.

He says further that when he was in McBride's place Sunday morning, he observed the man who later that day saw him at the City Hall; that he did not know Ledbetter but when he saw him at the City Hall he recognized him as a person he had seen at McBride's.

Clark, the operator of the Chicken Shack, testified Ivey did come to his place that Saturday night; that he had a woman in his car, who wanted to go to Durant or Vaiden.

McBride testified he operated an eating and drinking place called "Woody's Drive In," on Highway 12 just east of Durant on the way to Kosciusko and that he had known Ledbetter some six months, and Ledbetter before the time here involved had tried to sell him some whisky; that Ledbetter came to his place about 2:30 Sunday morning and remained until about 4:30. Ledbetter told him he had been robbed and he had the car tag number of the man who robbed him; that Ivey came to his place at about 11:30 that Saturday night; he had a woman in his car; that Ivey drank some beer and left; that he returned about 4 o'clock on Sunday morning, and drank some more beer; that Ivey was about drunk; that Ledbetter told him he had been robbed across the Mississippi River from Vicksburg but later said it was "down the road." Witness admitted he had been convicted of selling whiskey. The sheriff of Holmes County and the

mayor-elect of Durant, a former justice of the peace, testified that McBride's general reputation as a law-abiding citizen and for truth and veracity was bad. The state endeavored to show that McBride was connected with Powell Brothers, who it may be inferred from the record, were rather notorious as being engaged in the sale of intoxicating liquors in the vicinity of Durant. McBride testified that one of the Powell Brothers was the owner of a Chrysler Town and Country sedan. At the time of the trial McBride was working at and renting a place owned, as was expressed, by "Mrs. Blackjack Powell."

Defendant introduced a witness by name of Douglas Conn. He had been convicted of knowingly receiving stolen property and was then confined in jail at Jackson, Mississippi. He had also been convicted for failure to report for military service. Ledbetter had been brought to Jackson and placed in jail awaiting time to testify in this case, his parole having been revoked after the happenings of the events here disclosed. Conn said Ledbetter told him Ivey had robbed him but that he said it took place "up close to Durant," but he also said it occurred on Highway 80; that he, Ledbetter, went to Durant, saw Ivey in a cafe and there took down the tag number of Ivey's automobile. McBride had also said Ledbetter got the Ivey car tag number while they were at his place.

Kelley, a deputy sheriff, testified that Ledbetter carried him to the place on Highway 80 near Bolton where the robbery took place.

The mayor and a newspaper editor of Kosciusko testified Ivey's reputation was good—at least, it had been, according to their information, prior to the time of the events herein.

 Is this evidence sufficient to support the verdict of guilty? Under our judicial system it is the function of the jury, and especially so in criminal cases, to pass upon the weight and worth of the evidence and the

credibility and veracity of the witnesses, and we cannot set aside a verdict of guilty unless it is clear such verdict is the result of prejudice, bias or fraud, or is manifestly against the weight of the credible evidence. Young v. State, 150 Miss. 787, 117 So. 119; Witt v. State, 159 Miss. 478, 132 So. 338; Evans v. State, 159 Miss. 561, 132 So. 563.. ██ ██ The jurors may accept the testimony of some witnesses and reject that of others; may accept in part and reject in part testimony of any witness, or may believe part of the evidence on behalf of the state and part of that for the accused. Woodward v. State, 180 Miss. 571, 177 So. 531, 178 So. 469.

There is no intimation of fraud or wrong-doing on the part of the jury in this case.

Nor is there any evidence of bias or prejudice against accused. Indeed, the circumstances, tested by normal human reactions, would reasonably lead to sympathy, or bias, in his favor.

The alleged victim and chief prosecuting witness was a non-resident of this state, unknown to any of the jurors so far as this record discloses, and was then under sentence for his crime. The defendant was, and had been for years, a resident citizen of this state, a man of family, a constable and a deputy sheriff. The jurors knew the effect a guilty verdict would have upon him personally and upon his family. Certainly there is nothing here to indicate the jurors were prejudiced against him.

██ ██ The weight of the evidence and the credibility of the witnesses were peculiarly questions for the jury under the circumstances of this case. The State's case rests mainly upon the testimony of Ledbetter. He gave a plausible reason for going to the vicinity of Durant after the robbery. Sims, the city marshal of Kosciusko, testified to the fact underlying that reason. Ledbetter was supported by a defense witness as to what he said happened at Durant. He was corroborated by city and county officials as to the events in Kosciusko. He went straight to the city officials and made his accusation

against Ivey. When he saw Ivey he immediately accused him in the presence of these city officials. He was a stranger in Ivey's hometown. Ivey went to his home, procured the money and paid it to Ledbetter in the presence of his fellow-officials and friends. Instead of doing that, he could have had Ledbetter arrested. That would have been more in accord with innocence than paying over to Ledbetter the money which Ledbetter said had been taken from him by Ivey. Ledbetter and the two Kilgores came back to Kosciusko the next day. They did not act secretly. The officials knew they were there. They did not hide their presence or their purpose. Too, the alibi of defendant was not likely to appeal to the jurors. It is dubious both in point of fact and quality. The main witness, undertaking to support him, was certainly of doubtful veracity. We do not enlarge upon the reasons justifying the verdict. Summed up, it is easily understandable the jurors could have concluded that the entire alibi fabric was of rotten tissue. They heard the witnesses testify, saw their demeanor on the stand and had the records of the witnesses before them. They were in better position than is this Court to properly pass upon the veracity of the witnesses and give weight to their testimony.

Appellant made a number of objections to testimony which were overruled. We have carefully examined all of them. There were some errors but no reversible error. It would unduly lengthen this opinion to detail and discuss all of them. ██ We will mention one as illustrative, in effect, of the others. We have referred to the testimony given by witness McBride. He claims defendant stopped at his eating and drinking place twice Saturday night. The district attorney, on cross examination, asked him if the sheriff had not raided his place eighteen times. This was not competent. The manner of attacking a witness, other than by character witnesses, is to prove former conviction of crime. Section 1693, Code 1942. But the witness answered, ''I imagine more than

that." He was then asked, "Whom do you sell whisky for there?" and he replied, "For myself." Now, that was a confession he was violating the law, although not proof of a conviction. But we do not feel called upon to set aside a verdict and grant a new trial merely because the witness says he is violating the law when the proper method of attack is to show he has been convicted therefor.

Some of the objections are based upon questions of the state's attorney in response to information elicited from witnesses by counsel for appellant. ▮▮ Some objections are directed to testimony so interlaced with competent evidence the trial judge could not unscramble the situation and separate the competent from the incompetent. A trial judge is in a difficult position in passing upon the competency of evidence. He must decide questions immediately. He has no opportunity to weigh and study and investigate the questions. If a critical spyglass examination should be made of every word of evidence few convictions would be affirmed. It is only when a defendant has been materially prejudiced, or deprived of some substantial right, that cases should be reversed for wrongful admission of testimony. We find no such result in this case.

Lastly, as to the argument of the district attorney, complaint is made thereof in two respects. He said, "Gentlemen, all the lawyers know and will tell you that whenever whisky is transported by automobile from the State of Louisiana through Mississippi to the State of Alabama, that it is interstate commerce and is therefore most probably legal property and not a violation of the laws of this state". The objection should have been sustained to this argument but the question is whether the failure to do so is reversible error. In this state it is the province of the trial judge to announce the law to the jury. The jurors know that. That was, of course, done in this case. In the next place appellant was not charged with taking whisky from Ledbetter. The charge was

robbing him of $360 ''good and lawful money of the United States of America.'' It will be noted, too, the district attorney did not make the positive assertion that the transportation of this whisky through Mississippi, under the circumstances, was not a violation of the law. He said it was ''probably legal property and not a violation of the laws of this state.'' Presumably this jury consisted of twelve men of average intelligence. Such a juror knows the prosecuting attorney is endeavoring to convict, and counsel for defendant is endeavoring to acquit, the accused. It may be assumed that jurors make allowance for overstatements and claims of attorneys in their enthusiasm for their clients and in the heat of contest. If we critically examined and analyzed everything said and done by attorneys during the trial of a hotly contested, long drawn out law suit, and reversed a case each time such sayings and actions transgressed strict rules, comparatively few convictions would be sustained. It is only when it is clear such transgressions have occurred and when they have deprived parties of some substantial right and it is evident that they have suffered material prejudice and have not had a fair trial, that such transgressions should work a reversal of cases. We cannot say that is the effect here, merely because the district attorney expressed it as his opinion, and what he thought was the opinion of other attorneys, that the transporting of this whisky through Mississippi to Alabama was ''probably'' not a violation of the laws of this state.

Again, the district attorney in his argument to the jury said, ''I say in this case that this car (meaning as he stated before the 1948 Town and Country automobile which Ledbetter gave chase to in Durant when he passed through said town after having been allegedly robbed by the defendant) belongs to one of the Powell Brothers.'' Defendant objected to this and the objection was overruled.

This was a conclusion of the district attorney. ██ ██ Lawyers have a right, and indeed it is a duty, to deduce and argue reasonable conclusions, based upon the evidence, which are favorable. to their clients. Here Ledbetter had testified that the driver of the Chrysler Town and Country automobile whom he chased at Durant was the man who sold him the whisky. There was other evidence in the record that the Powell Brothers owned such a car. The conclusion that they did own the Town and Country car chased by Ledbetter may not have been very strong from the evidence, but it was a legitimate deduction. It was the function of the jury to determine the logic and weight of the conclusion.

Affirmed.