# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-CT-00887-SCT

*RONALD OWENS a/k/a DO IT*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2021 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | STEPHANIE ALEXIS BROWN |
| | ROSHARWIN LEMOYNE WILLIAMS |
| | DAVID LYDELL TISDELL |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY:  JUSTIN T. COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  BARBARA BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/28/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     In 2021, a jury convicted Ronald Owens for burglary of a business under Section 97-17-33(1) (Rev. 2014).  Owens was sentenced to serve seven years as a habitual offender pursuant to Section 99-19-81 (Rev. 2020).  After the jury returned a verdict of guilty at trial, Owens moved for a J.N.O.V. or, in the alternative, for a new trial.  The trial judge denied both motions.  Owens appealed only the denial of a new trial.  The Court of Appeals

affirmed. ***Owens v. State***, No. 2021-KA-00887-COA, 2022 WL 17422175, at \*6 (Miss. Ct. App. Dec. 6, 2022). This Court granted Owens's petition for certiorari. The only issue presented is whether the trial judge abused his discretion by denying Owens's motion for new trial. We affirm the jury's verdict and the decision of the trial court.

## FACTS AND PROCEDURAL HISTORY

¶2. On Saturday, October 7, 2017, the Clarksdale Police Department (CPD) received a call from a third-party alarm company at 8:11 a.m., alerting the police that the security alarm at Henderson Economy Drugs (Economy Drugs) had been triggered. Economy Drugs was closed during weekends. Two officers were assigned to respond but reported no evidence of forcible entry.

¶3. On Monday, October 9, 2017, at approximately 9:00 a.m., Val Soldevila, a pharmacist and then-owner of Economy Drugs, called CPD when he arrived and found not only the back door unlocked but also the burglar alarm system disabled. A CPD officer responded. State's Exhibit S-1 is a disc that was taken from the officer's body camera recording. S-1 documented the officer's investigation with audio and video.

¶4. S-1 revealed a metal ladder propped against the ceiling in Soldevila's office, a hole in the roof, and an open cabinet behind the drug counter. Soldevila explained to the officer that Economy Drugs kept narcotics in the cabinet and that the cabinet had been emptied. State's Exhibit S-8 was a copy of the report that Soldevila submitted to the Mississippi Bureau of Narcotics, verifying that controlled substances valued at $14,028.05 were missing,

2

as well as $3,000 in cash. State's Exhibit S-9 was a photograph of a prying tool, similar to a chisel, left on Soldevila's desk in his office.

¶5. CPD Captain Whit Read was also dispatched to investigate the burglary. Read began to search the nearby area for surveillance cameras. Read observed that a hospice located directly across the street from Economy Drugs had cameras that overlooked the back door of the pharmacy. Read contacted the hospice and obtained its surveillance footage.

¶6. The hospice video was introduced into evidence as State's Exhibit S-4 and was played for the jury in conjunction with Read's testimony.[1] S-4 revealed that at around 8:15 a.m. on October 7, 2017, a person wearing dark clothing—a black shirt, dark pants, white shoes, and black socks—exited the back door of Economy Drugs. The video captures the person's gait, stride, and upper body movements while walking. The video further revealed this person carrying a dark bag over the right shoulder, walking north in the direction of a Double Quick gas station until out of camera range.

¶7. Read testified that he then contacted the Double Quick, requesting to view its *exterior* security footage overlooking the road and parking lot during that same time frame, as well as its interior security footage of inside the store. Double Quick provided Read with

---

[1]Images obtained from the hospice video and the Double Quick videos, which will be discussed, are attached to this opinion as an appendix. Providing these images serves a two-fold purpose. First, the images utilized in the Court of Appeals' dissent fail to recognize or address the entirety of the Double Quick video footage as Owens approaches. The images also expose the weakness and inconsistency of Owens's argument vis-a-vis the facts.

surveillance footage taken by sixteen cameras, resulting in multiple videos for each camera. The series of videos obtained from Double Quick were introduced into evidence as the State's Exhibit S-5.

¶8.     S-5 was played to the jury in conjunction with Read's testimony during pauses of the video.  Camera two, a camera capturing the exterior approach of Double Quick, revealed an image of a person approaching with identical features as the image in S-4: the same height and build, the same clothing, the same mannerisms while walking, and the same dark bag over the right shoulder.

¶9.     As the person, later identified as Owens, neared the entrance of Double Quick, the clarity and color of the S-5 videos improves significantly.  The dark all-purpose bag that at first appeared black revealed a bright red color as well.  S-5 also revealed a white logo on the red coloration.[2]

¶10.    S-5 also captured the interior of Double Quick.  As Owens walked towards the drink cooler, the video reveals a predominantly red bag.  Then, as Owens walked back toward the register, the video reveals a predominantly black color.  When Owens exited Double Quick, the all-purpose bag appears predominantly black, while also clearly revealing some red.

¶11.    Read took a screenshot of Owens waiting in line for the register in which his facial features were more distinguishable.  Read disseminated that image throughout the department.  The screenshot was introduced into evidence as the State's Exhibit S-6.

---

[2]*See* ¶ 15.

4

¶12. CPD officer Taylor testified that he identified the person in the screenshot as Ronald Owens. Investigator Eddie Earl obtained an arrest warrant for Owens based on Taylor's identification. Earl testified that he went to Owens's home to execute the warrant but was informed that he was at work. Later that day, Owens arrived at the police department to turn himself in.

¶13. Earl testified that he then obtained a search warrant for Owens's residence. Inside Owens's home, Earl photographed a large stock bottle that "had a label on it but no name," only a "red X" with "an Economy Drug Store stamp on it." That photograph was introduced into evidence without objection as State's Exhibit S-11.

¶14. Soldevila testified that Economy Drugs maintained the kind of stock bottles photographed in S-11. Soldevila explained that either pill or liquid medications were stored in stock bottles before individual prescriptions were filled. Soldevila testified that some narcotics stolen in the burglary were in liquid form, but "I can't say specifically for that [stock bottle photographed in S-11] because I can't read the label on there . . . ."

¶15. Earl also found a duffle bag, much larger and of a different shade than the all-purpose bag in the Double Quick videos, yet he testified that it "appeared to have looked like the bag Mr. Ronald Owens had in his possession at the time of the Double Quick video." Photographs of the duffle bag were introduced as State's Exhibits S-13 and S-14. During cross-examination, the duffle bag was introduced as Defense's Exhibit D-1. Ostensibly, D-1 was used to raise doubt of Earl's testimony. The State established through Soldevila's

5

testimony that the bags kept inside his office did not look like the red duffle bag photographed in S-13 and S-14 and introduced as D-1. Soldevila described the bags in his office as having two handles, a zipper on the top, red and black color, displaying a written logo[3]; the bags were not "luggage" bags but handbags.

¶16.    After the State rested its case-in-chief, Owens moved for a directed verdict. The trial judge denied that motion. The jury returned a guilty verdict, and Owens moved for a J.N.O.V. or, in the alternative, for a new trial. Not swayed by his arguments, the trial judge, relying on the facts presented and applicable law, denied those motions as well. Owens appealed solely the trial judge's denial of his motion for new trial. The Court of Appeals affirmed. *Owens*, 2022 WL 17422175, at *6. Owens sought a writ of certiorari, which this Court granted.

## STANDARD OF REVIEW

¶17.    A motion for new trial is different than a motion for directed verdict or J.N.O.V., which challenge the sufficiency of the evidence. "While the motion for [J.N.O.V.] presents to the trial court a pure question of law, the motion for a new trial is addressed to the trial court's sound discretion." *May v. State*, 460 So. 2d 778, 781 (Miss. 1984) (citing *Neal v. State*, 451 So. 2d 743, 760 (Miss. 1984)). As such, the Court in *May* wrote that "[u]nder our established case law, the trial judge should set aside a jury's verdict only when, in the exercise of his sound discretion, he is convinced that the verdict is contrary to the substantial

---

[3] *See* ¶ 9.

weight of the evidence." *Id.* (citing *Pearson v. State*, 428 So. 2d 1361, 1364 (Miss. 1983)).

¶18.    As far back as 1854, this Court has not wavered from that standard:

> The granting a new trial rests in a great measure upon the *sound discretion* of the court below, to be exercised under all the circumstances of the case with reference to settled legal rules as well as the justice of the particular case.  If a new trial be refused, a strong case must be shown to authorize the appellate court to say that it was error; and so, if it be granted, it must be manifest that it was improperly granted.

*Dorr v. Watson*, 28 Miss. 383, 395 (1854) (emphasis added).

¶19.    Unlike a motion for a directed verdict or J.N.O.V., appellate courts review the grant or denial of a motion for new trial for an abuse of discretion.  *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017).  Abuse of discretion is an appellate court's most deferential standard of review.  In carrying out our review, "we weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'"  *Id.* (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).  "Any less stringent rule would denigrate the constitutional power and responsibility of the jury in our criminal justice system."  *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983).

### DISCUSSION

¶20.    Owens contends that the State presented no evidence that he burglarized Economy Drugs.  If there was no evidence as argued, Owens should be acquitted.[4]  The learned trial

---

[4]Such a statement is better reserved for a motion for directed verdict or J.N.O.V., i.e., to challenge the sufficiency of the evidence.  When reviewing a challenge to the sufficiency

judge thrice ruled on the evidence presented, twice on the sufficiency of evidence, and once on the weight of evidence. During trial, Owens moved for a directed verdict. The trial court found that the requisite proof for each element of the crime had been met. Owens again challenged the sufficiency of the evidence by moving for a J.N.O.V. after the jury rendered its verdict, as well as challenging the weight of the evidence by moving for a new trial in the alternative. The trial judge denied those motions as well. No claim or argument was presented at trial or to this Court that the jury's verdict resulted from bias or that the jury was somehow prejudiced. The jury followed the evidence and instructions of the trial judge and unanimously convicted Owens.[5]

¶21. Owens's failure to appeal the denial of his motions for directed verdict or J.N.O.V. is telling and for just reason. The jury was presented direct, circumstantial, physical, and real-time evidence, some of which conflicted. Owens is not a victim of an unconscionable injustice. On the contrary, it would be an injustice not only for the victim but also to the rule of law if we nullified the jury's verdict.

¶22. Owens posits that color is an objective property. As such, he contends that black

of the evidence, "we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." **Lenoir v. State**, 222 So. 3d 273, 279 (Miss. 2017) (citing **Poole v. State**, 46 So. 3d 290, 293 (Miss. 2010)).

[5]The trial judge instructed the jury that "[t]he evidence which you are to consider consists of . . . any exhibits offered and admitted into evidence. You are permitted to draw such reasonable inferences from the evidence as seems justified in the light of your own experience." This Court presumes that jurors follow the instructions of the trial court. **Pitchford v. State**, 45 So. 3d 216, 240 (Miss. 2010); *see* Diss. Op. ¶ 55.

cannot be red and that red cannot be black. Owens urges the Court to adopt the language of the Court of Appeals' dissent, opining that "[a] reasonable person could not conclude that the bright red bag carried by this person is the same as the black one carried by the person in the hospice footage." *Owens*, 2022 WL 17422175, at *8 n.4 (McCarty, J., dissenting).

¶23. This specific issue was contested at trial, argued to the jury, and rejected by the jury and judge alike. The jury could rationally conclude that the black and red all-purpose bag Owens carried in the Double Quick interior videos is one and the same as the bag Owens carried in the Double Quick exterior and hospice videos. The jury could have rationally concluded that the person in the Double Quick interior videos was the same as the accused, who was seated before them. The images from the exterior videos support a reasonable inference that the individual who wore identical clothing as the person in the hospice video, walking in the same manner from the same direction as the pharmacy and carrying a dark bag during the same time frame as the burglary, was one and the same person.

¶24. An appellate court intrudes upon the jury's role of fact-finding if it fails to consider all of the credible evidence. Our role is solely to determine whether the trial court abused its discretion by denying Owens's motion for new trial. In making that determination, we review whether the verdict is contrary to the overwhelming weight of the evidence in the light most favorable to the verdict.

¶25. Unlike appellate courts, which review cold records, trial courts smell the smoke of the battle. The Court in *Gavin v. State* stated:

9

We sit as an appellate court, and as such are ill equipped to find facts. . . . [E]ven if we wanted to be fact finders, our capacity for such review is limited in that we have only a cold, printed record to review. The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to make findings of fact which will have the reliability that we need and desire.

*Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985). Based on the unique position of a trial judge, "[t]his Court justifiably refuses to review grants of a new trial based in part on the superior position of the trial court to decide such matters." *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 948 (Miss. 2000) (citing *Dorr*, 28 Miss. at 395).

¶26. This Court has repeatedly established an appellate court's review of the jury's role and function. The Court in *Gandy v. State* held that

Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.

*Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979) (citing *Shannon v. State*, 321 So. 2d 1, 2 (Miss. 1975)). Further, the Court in *Bond v. State* wrote that

In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witness, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury.

10

*Bond v. State*, 249 Miss. 352, 162 So. 2d 510, 512 (1964) (citing *Ivey v. State*, 206 Miss. 734, 40 So. 2d 609, 613 (1949)).

¶27.   At trial, Owens's attorney argued that the police investigation was deficient, asserting a laundry list of many perceived shortcomings, save obtaining the defendant's confession.[6] But "the sufficiency or insufficiency of a police investigation simply goes to the weight of the evidence, and it is for a jury to decide what to believe." *Morris v. State*, 927 So. 2d 744, 748 (Miss. 2006) (citing *Cox v. State*, 849 So. 2d 1257, 1267 (Miss. 2003)).  This Court has held that "a limited amount of physical evidence, in itself, does not mean that a guilty verdict was against the weight of the evidence.  *See Moore v. State*, 933 So. 2d 910, 922-23 (Miss. 2006) (burglary conviction not against the weight of the evidence where there was no physical evidence tying defendant to crime)." *Blanchard v. State*, 55 So. 3d 1074, 1079 (Miss. 2011).

¶28.   Of the evidence that was presented, S-4 revealed an individual exit the pharmacy within minutes of its alarm being triggered on October 7, 2017, with a dark bag over their right shoulder.  Economy Drugs was closed all weekend.  S-4 showed this individual walk north out of Economy Drugs' parking lot in the direction of Double Quick located nearby.

---

[6]Counsel urged the jury to consider the lack of fingerprints on the ladder or anywhere inside the pharmacy, the lack of DNA at the crime scene, the lack of eyewitnesses, the lack of recovering any of the drugs taken, and the lack of testing the liquid inside the stock bottle, and that no credible evidence linked Owens to the burglary.  The same perceived shortcomings that the Court of Appeals' and today's dissent raised were presented to and rejected by the jury.

¶29. The jury was presented video evidence of Owens approaching the Double Quick parking lot shortly after Economy Drugs' alarm was triggered, identically matching the characteristics of the person who walked out of the hospice camera view. The Double Quick exterior videos, S-5, showed that Owens's clothing as he crossed into the parking lot identically matched the person's in the hospice video. The S-5 exterior footage also shows that the dark bag first appears black until Owens walks closer to the camera, revealing its red fabric. The jury was presented with clear evidence identifying this person as Ronald Owens. They were able to compare the person in the videos while observing Owens seated before them.

¶30. The jury was presented with a photograph of a stock bottle found in Owens's home, and Earl testified that the stock bottle was marked and labeled with Economy Drugs' stamp. Owens was neither an employee nor customer of the pharmacy, yet an unprescribed, marked, and labeled pharmaceutical stock bottle from the burglarized pharmacy was found inside his residence. Stock bottles that were inside Economy Drugs at closing on Friday were missing the following Monday.

¶31. The large duffle bag that Earl photographed and recovered from Owens's residence presented conflicting evidence for the jury to resolve. Earl testified that the large duffle bag appeared to be the bag that Owens possessed in the Double Quick videos. Owens's introduction of the physical bag, D-1, was to impeach Earl. The State used Soldevila's description of the all-purpose bags that he kept in his office to distinguish the large duffle

bag with black piping from the smaller, dual-colored all-purpose bag Owens carried in the Double Quick videos. The jury was not only free to disregard Earl's testimony, but it also was free to reject Owens's suggestion that his blunder fatally tainted the entire prosecution.

## CONCLUSION

¶32. Our standard of review is a restraint on appellate courts from invading the sanctity of jury trials. Intrusion into that sanctum is reserved for only the most egregious of cases. In the case *sub judice*, the State presented competent evidence that met the legal requirements of proof.

¶33. The specific issue raised is whether a guilty verdict was contrary to the overwhelming weight of the evidence. It was not. Owens exercised his Fifth Amendment privilege and did not testify. Owens called no witnesses. Owens proffered one exhibit during the cross-examination of Earl, D-1, a large duffle bag.

¶34. The jury's function is to be the sole judge of the weight and worth of the evidence presented. Reversal would only be warranted if it is manifestly apparent that the trial judge abused his discretion. Reversal is not warranted, however, when appellate judges express doubts about the jury's verdict by reweighing the evidence. Appellate courts do not retry cases. The jury's verdict was validated by competent and relevant evidence from the Double Quick's exterior and interior footage.

¶35. Accordingly, we do not find that the jury's verdict is so contrary to the overwhelming weight of the evidence to nullify its verdict or the trial judge's decision to deny a new trial.

13

Appellate courts lack the authority to make separate factual judgment calls because they disagree with the jury's verdict. Our controlling legal standards instruct the opposite. When those standards are applied to all of the evidence introduced in this proceeding, this Court is required to affirm the jury's verdict and the trial court's judgment.

¶36.   **AFFIRMED.**

**COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶37.   The sole issue in this appeal is whether the trial judge abused his discretion by denying Ronald Owens's motion for a new trial after his conviction of burglary of a business. A motion for a new trial challenges the "weight of the evidence." *Little v. State*, 233 So. 3d 288, 291 (Miss. 2017) (citing *Bush v. State*, 895 So. 2d 836, 843-45 (Miss. 2005), *abrogated by Little*, 233 So. 3d at 292).

¶38.   To support Owens's conviction, the State primarily relied on: (1) the stock bottle found in Owens's home, (2) the red and black bag found in Owens's home, and (3) the surveillance videos.

*A.     Stock Bottle Found in Owens's Home*

¶39.   As Exhibit 11, the State admitted a photograph of two bottles found during the search of Owens's home.

14



The State also offered as Exhibit 12 a photograph of just the bottle on the right. Exhibit 12 clearly established that the bottle on right in this photograph was a prescription properly in Owens's name. The bottle on the left, however, was identified by pharmacist Val Soldevila as a "stock bottle." The State argues that the mere possession of this stock bottle by Owens is evidence of guilt.

¶40. The Court of Appeals' decision discusses certain facts about the stock bottle. *Owens v. State*, No. 2021-KA-00887-COA, 2022 WL 17422175, at *9-11 (Miss. Ct. App. Dec. 6, 2022). Some of the Court of Appeals' findings, however, are simply not factually accurate.

¶41. First, the Court of Appeals' opinion stated that "[t]he State introduced the 'stock bottle' from the Economy Pharmacy that was found in Owens'[s] home." *Id.* at *5. The State did not introduce the stock bottle. Instead, the State only introduced Exhibit 11, a

15

blurry photograph of the stock bottle found at Owens's home.

¶42. Second, the Court of Appeals' opinion stated that "[t]he bottle contained Promethazine, which was one of the medications reported stolen during the burglary." *Id.* at *4. The State offered no testimonial or documentary evidence at trial that the stock bottle in Exhibit 11 contained Promethazine. The State did not test the substance inside the bottle. No expert witness testified about the substance in the stock bottle. In fact, Soldevila testified that the stock bottle was of the kind used to store every kind of medication "from just regular every day aspirin all the way up to the narcotics."

¶43. Third, the Court of Appeals reasoned that there was an inference of guilt because "[t]here was no valid reason presented for Owens to possess this type of refill bottle from Economy Pharmacy. The jury could reasonably infer from this evidence that the bottle was stolen during the burglary." *Id.* at *5. To the contrary, Soldevila testified that he could not say whether the stock bottle found in Owens's house was one taken from his pharmacy *during the burglary*. Moreover, the State offered no evidence that the stock bottle contained any drug stolen during the burglary. No evidence established that Owens had no valid reason to possess a stock bottle. Without more, the Court of Appeals' conclusion is mere speculation and conjecture on which a guilty-beyond-a-reasonable-doubt verdict cannot rest.

¶44. After careful review of the Court of Appeals' findings and the evidence presented at trial, it is clear that the evidence based on the photograph, introduced as Exhibit 11, does not support the jury's verdict or allow the jury to infer Owens's guilt simply by the possession

16

of an unidentified stock bottle.

    *B.*  *Red and Black Bag Found in Owens's Home*

¶45. The State admitted into evidence two photographs of a red and black bag found in

Owens's house.  The following photographs were introduced as Exhibit 13 and 14:





¶46. The Court of Appeals ruled:

> [T]he State introduced *the red and black bag found in Owens'[s] home*. It is clear from the surveillance footage from Neveah Hospice that the suspect is carrying a bag over one shoulder. Officer Taylor identified Ronald Owens as the person in the Double Quick video carrying *a red and black bag* over his shoulder. A red and black bag was found in Owens'[s] home. Officer Earl testified that "it appeared to have looked like the bag that Mr. Ronald Owens had in his possession at the time of the Double Quick video."

*Id.* at *6 (emphasis added). The court concluded that "[i]t was for the jury to decide whether the bag found in Owens'[s] home was the same bag being carried by the suspect in the surveillance videos and whether this bag was circumstantial evidence of guilt." *Id.*

¶47. The evidence does not support the Court of Appeals' ruling. Soldevila testified that the red and black bag found in Owens's home *was not from his pharmacy*. Additionally, the State concedes this point in its supplemental brief:

> a review of [the Double Quick surveillance] video coupled with Soldevila's testimony . . . proved that the red [and black] bag [found in Owens's home] was not taken from the pharmacy, nor was it the same bag Owens had carried after the burglary[;] [t]he jury reasonably disregarded Officer Earl's testimony that Owens had carried the bright red [and black] bag at the Double Quick.

¶48. The red and black bag found in Owens's home provides no evidentiary support for Owens's conviction. There was simply no evidence that the red and black bag, depicted in Exhibits 13 or 14, was taken from Economy Drugs. Further, there is no evidence that the red and black bag, depicted in Exhibits 13 and 14, was the bag carried by Owens at the Double Quick. Finally, there is no evidence that the red and black bag, depicted in Exhibits 13 and 14, was the bag seen in the hospice surveillance video that was carried by the suspect after

18

the burglary.

¶49. After careful review of the Court of Appeals' findings and the evidence presented at trial, it is clear that the red and black bag in the photographs, introduced as Exhibit 13 and 14, does not support the jury's verdict of guilt beyond a reasonable doubt or allow the jury to infer Owens's guilt simply by the possession of a red and black bag.

### C. Surveillance Videos

¶50. We are left with the surveillance videos as the only possible evidence that would support Owens's conviction. The Court of Appeals noted that "the State relied heavily on two surveillance videos to circumstantially prove Owens was involved in the burglary." *Id.* at *6. Those videos were from Neveah Hospice and the Double Quick gas station. *Id.* The Court of Appeals explained:

> The Hospice video shows a male wearing a black shirt, jeans, white shoes, and a bag on one shoulder. The Hospice video shows the suspect leaving [Economy Drugs] and walking in the direction of the Double Quick. The Double Quick video shows an individual with a similar walk, height, and clothes, and with a bag over his shoulder walking into the Double Quick. While inside, the video shows the suspect's face and the color of the bag on his shoulder to be red and black. Officer Taylor testified that "the individual in the photo appeared to be Ronald Owens." Finally, the jury was shown the surveillance footage and the arrest photo of Ronald Owens. . . . [B]ased on the evidence and testimony before them, the jury was the trier of fact and had to determine whether the suspect in the surveillance footage was Owens.

*Id.* We must carefully examine each of these videos.

### i. The Neveah Hospice Surveillance Video

¶51. At trial, the State offered approximately one hour of surveillance video footage from

19

Neveah Hospice. This video clearly ties the person in the video to the burglary. But it clearly does not identify a person as the perpetrator.

¶52. This color video shows a person exit the back door of Economy Drugs. Economy Drugs is the tan building with a green colored roof. There is a door to Economy Drugs at the back left of the video. It shows a person exit the door and then walk to the sidewalk. The man then walks to the right out of the video. According to testimony, the person is walking in the direction of the Double Quick with a *black* backpack.

¶53. The video was approximately one hour long. The perpetrator was shown for less than one minute, from the 15:14 to the 16:05 mark. Although the video is clearly in color, the only video of the perpetrator shows a black (or dark) colored shirt, pants, backpack, and white shoes. The hospice video offers no evidence that the backpack in the video was red. The following is a still photograph from the video:



Further, a reasonable inference may not be drawn that the bag depicted in Exhibits 13 and 14 was the backpack or bag shown in the hospice surveillance video.

¶54. After careful review of the hospice surveillance video, the video does not support the jury's verdict or allow the jury to infer Owens's guilt beyond a reasonable doubt. The hospice surveillance video does not identify any person as the perpetrator of the burglary of Economy Drugs. At most, it supports an inference that the perpetrator, wearing black (or dark) colored clothes and white shoes and carrying a black backpack, walked in the direction of the Double Quick.

ii.     *The Double Quick Surveillance Video*

¶55. The trial court admitted Exhibit 5, a CD from the Double Quick that contains video recordings from sixteen different cameras, with approximately fifteen recordings per camera. Exhibit 5 was admitted without objection. Upon admission, the State asked the Court for "permission to publish State's Exhibit 5," and the Court responded, "Yes, you may." The trial transcript does not indicate exactly which recordings were published to the jury. A careful examination of the videos shows a very active convenience store with many people going in and out of the store.

¶56. Notably, the trial testimony related to the surveillance videos provides insufficient details to establish that a person walking from Economy Drugs would approach the Double Quick in the same direction as Owens. The State offered no witness testimony to clarify or sequence the hospice surveillance videos with the Double Quick videos.

21

¶57.    The Double Quick surveillance videos, however, do show a person walk into the store from the street carrying a *red and black* bag.  In the Double Quick videos, Owens and the features of the red and black bag can clearly be seen.

¶58.    The hospice surveillance video does not indicate the suspect's backpack was any color other than black.   In the hospice surveillance video, the suspect sets the black backpack down and later picks it up.  The suspect then carries the backpack for almost a minute and the only visible color is black.  No red is visible on the backpack at any time even though the suspect moves it around.  The Court of Appeals' dissenting opinion correctly notes:

> The hospice video is in color—we can see the green roof of the store, the red roof of the donation box by one of the parking lots, and green grass. But the Bigfoot figure throughout the footage is carrying what appears to be a completely black bag.
>
> In the video, we can see the figure in silhouette walking by the red-roofed donation box. The red of the box contrasts with the all-black upper body form of the figure. We can also ascertain white tennis shoes. But no red can be seen on that figure.
>
> In contrast, in the interior footage from the gas station, the person identified as Ronald Owens is carrying a bright red bag. A reasonable person could not conclude that the bright red bag carried by this person is the same as the black one carried by the person in the hospice footage.

*Owens*, 2022 WL 17422175, at *8 n.4 (McCarty, J., dissenting).

¶59.    The State points to the fact that Owens, like the burglary suspect, was wearing a black shirt, dark pants/jeans, and white tennis shoes.  But this is hardly unique attire.[7]  The fact that

---

[7] Defense counsel notes that the Air Force One tennis shoes that the suspect was allegedly wearing was one of the top selling sneakers of the year.

Owens was wearing a black shirt, dark pants/jeans, and white shoes does not make him guilty of the burglary of Economy Drugs.

¶60.　The State asserts that "both [surveillance] videos support the jury's finding that the bag Owens carried—a tote-style bag made of red and black fabric that, depending on the angle and the way it was carried looked red or black—was the same bag the suspect carried." Again, the State argues the jury could rely on the bag to convict Owens.  If the bag in the separate videos was the same color, we could agree.  But it is not.

¶61.　Pharmacist Val Soldevila was questioned about the red and black bag and was shown the Double Quick videos.  He testified:

> Q.　Now, let me ask you, the bags that you had in your office, can you describe how they were?
>
> A.　Yes. Just kind of, I guess, a carryall bag. You know, it's got two handles, a zipper on the top, and like I said, it's, you know, either red and black or red. You know it was kind of—through the years they kind of change them up a little bit, but most of them had "QSI" on there as far as, you know, the company that actually handed them out.
>
> Q.　And so you mentioned "QSI." So was there some writing on those bags?
>
> A.　Yeah, they had their logo or emblem on there.
>
> MS. BROWN: . . . Let the record reflect that I'm showing this witness what has been previously admitted into evidence as State's Exhibit 5 [CD of Double Quick video]. Mr. Soldevila, I'm gonna skip to a part—(stopped).
>
> (THE PLAYING OF SAID EXHIBIT COMMENCED.)
>
> I'm gonna show you one additional video.

(THE PLAYING OF SAID EXHIBIT COMMENCED.)

I'm gonna pause it right there.

Q.      Mr. Soldevila, the bags that you mentioned that were in your office, can you describe—you mentioned that they were red and black. Can you describe—how many handles did they have?

A.      Well, I guess you would say two handles, one on each side of the zipper, yes.

Q.      One on each side of the zipper?

A.      Um-hum.

¶62.    The State did not ask Soldevila whether the pharmacy's red and black bag was in fact the bag worn by Owens in the Double Quick video.  Thus, Soldevila did not offer any evidence that Owens was wearing the pharmacy's red and black bag when he was in the Double Quick.

¶63.    The majority suggests that Officer Earl's testimony provided the link between the red and black bag from the pharmacy and the red and black bag carried by Owens in the Double Quick video.  Maj. Op. ¶¶ 15, 31.  Officer Earl, however, testified about the red and black bag *found in Owens's house* (Exhibits 13 and 14).  Officer Earl testified that "it appeared to have looked like the bag that Mr. Ronald Owens had in his possession at the time of the Double Quick video."  But Soldevila and the State conceded that Officer Earl's testimony was wrong.  The red and black bag found in Owens's home, Exhibits 13 and 14, was not carried by Owens in the video. There was simply no evidence to link the pharmacy's red and black bag to the red and black bag carried by Owens in the Double Quick video.

24

¶64. The *only* credible evidence presented by the State was a series of surveillance videos. The State offered no evidence of the sequence from the time of the hospice surveillance video to the Double Quick surveillance videos. A careful review of these videos simply does not prove beyond a reasonable doubt that Owens burglarized the pharmacy.

¶65. "A greater quantum of evidence favoring the State is necessary for the State to withstand a motion for a new trial, as distinguished from a motion for j.n.o.v." ***May v. State***, 460 So. 2d 778, 781 (Miss. 1984). The jury was not presented with credible evidence to support a reasonable inference that Owens was the individual who burglarized the pharmacy. The State offered no evidence of fingerprints, DNA, or other physical evidence that linked Owens to the burglary. No evidence connected the ladder or burglary tools found at the scene to Owens, no evidence connected any fingerprints found at the scene to Owens,[8] no evidence connected the bag found in Owens's house to the pharmacy's burglary, and no evidence connected the stock bottle found in Owens's possession to the pharmacy's burglary. And simply because the bag carried in the Double Quick videos "first appear[s] black" does not amount to a reasonable inference that it was Owens who burglarized Economy Drugs. Maj. Op. ¶ 9. "A reasonable person could not conclude that the *bright red bag* carried by th[e] person [in the Double Quick videos] is the same as the *black one* carried by the person in the hospice footage." ***Owens***, 2022 WL 17422175, at *8 n.4 (emphasis added).

_____

[8] Multiple items were sent to the crime lab for testing. When asked whether Owens's fingerprints or DNA were found on any items collected from the crime scene, Investigator Earl responded that because of a job change, he did not follow up with the crime lab.

¶66. "[W]here the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses, it is the jury's duty to resolve the conflict." *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008) (internal quotation marks omitted) (quoting *Nicholson v. State*, 523 So. 2d 68, 71 (Miss. 1988)). Here, the record reflects no conflict in the evidence. There is simply no evidence that the stock bottle found in Owens's house contained any of the drugs stolen during the pharmacy's burglary, the red and black bag found in Owens's house did not come from Economy Drugs and does not appear in either of the surveillance videos, and the backpacks seen in the surveillance videos are clearly different colors.

¶67. The State offered no evidence of the stolen narcotics. The State offered no evidence of any fingerprints or DNA from the crime scene. There was no evidence of fingerprints on the ladder, the ripped open roof, the knife found on the roof, the chisel, or the safe. The pharmacist even testified that Owens's red backpack did not come from the pharmacy. And, after viewing the Double Quick videos, the pharmacist did not testify that the red and black bag carried by Owens in the Double Quick videos was the same as the black one carried by the person in the hospice footage or one that came from the pharmacy. There is simply no evidence, surely not evidence beyond a reasonable doubt, that Owens broke into Economy Drugs.

¶68. "Our role as appellate court is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little*, 233 So. 3d at 292. We must "weigh the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so

26

contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Id.* (alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)). When we apply this standard here, I find an abuse of discretion in the trial court's denial of Owens's motion for a new trial. As a result, I would reverse the judgment of the Court of Appeals and the judgment of the Coahoma County Circuit Court, and I would remand this case to the Coahoma County Circuit Court for a new trial.

**KITCHENS AND KING, P.JJ., JOIN THIS OPINION.**



S-4: Hospice



S-4: Hospice



S-4: Hospice



S-4: Hospice



S-4: Hospice



S-5: Double Quick Exterior



S-5: Double Quick Exterior



S-5: Double Quick Exterior



S-5: Double Quick Exterior



S-5: Double Quick Exterior

29



S-5: Double Quick Exterior



S-5: Double Quick Interior



S-5: Double Quick Interior



S-5: Double Quick Interior



S-6: Screenshot; S-5 Interior



S-5: Double Quick Interior



S-5: Double Quick Interior

30