# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01275-COA

AHMAD GRANT A/K/A AHMAD RASHAD GRANT                    APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

DATE OF JUDGMENT:               10/10/2023
TRIAL JUDGE:                    HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:      MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         SANFORD E. KNOTT
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: JULIANNE KAY BAILEY
DISTRICT ATTORNEY:              JOHN K. BRAMLETT JR.
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 06/02/2026
MOTION FOR REHEARING FILED:

EN BANC.

EMFINGER, J., FOR THE COURT:

¶1. Ahmad Grant was convicted in the Circuit Court of Madison County, Mississippi, for the offenses of possession of a firearm by a felon and possession of a stolen firearm. After his post-trial motions were denied, he appealed. On appeal, Grant raises four issues: (1) Whether the evidence was sufficient to support his conviction of possession of a firearm by a felon: (2) whether the evidence was sufficient to support his conviction of possession of a stolen firearm; (3) whether the trial court erred in admitting evidence that he was affiliated with a gang for impeachment purposes; and (4) whether the trial court erred in admitting into evidence expert testimony regarding cellphone-location technology. Finding no reversible

error, we affirm Grant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     On January 17, 2023, while traveling southbound on I-55 in his red Porsche, Grant was stopped by Madison Police Department (MPD) Officer Jason Laxer. Laxer initiated the traffic stop because the paper tag on the vehicle was not properly secured and was impossible to read. Grant was the only occupant of the vehicle. Once Laxer made contact with Grant through the passenger window, he asked Grant for his driver's license and insurance information.  During that process, Laxer smelled the odor of marijuana coming from the vehicle. After receiving Grant's license, Laxer told Grant he was going to write him a warning citation because of the tag and asked Grant to step out of the vehicle.

¶3.     At that point, Laxer informed Grant that he could smell marijuana in the vehicle. For officer safety, Laxer performed a pat-down search of Grant for weapons. Laxer noticed bulges in Grant's front pockets, and Grant told him that it was about $8,000 in cash. Laxer then advised Grant that he was going to search the vehicle. During this search, Laxer recovered a firearm from under the driver's seat. Laxer cleared the gun (ensured it was unloaded) and had dispatch run the serial number. Laxer was advised by dispatch that the firearm had been reported stolen by the Canton Police Department. During the on-scene investigation, Laxer also determined that Grant had previously been convicted of a felony.[1] Grant was arrested that day and was later indicted by a Madison County grand jury.

¶4.     At trial, in addition to the above facts, Laxer identified his bodycam video recording

---

[1] At trial, the parties stipulated that Grant was a felon at the time of this traffic stop.

of his interaction with Grant during the traffic stop, and it was admitted into evidence. After Laxer told Grant that he had found the firearm in the vehicle, and without even seeing the firearm, Grant told Laxer that it was his brother's gun. Grant assured Laxer that the gun was "clean" and offered to call his brother to support his statement. At trial, Laxer testified that "clean" meant that the firearm was not stolen or "hot." Laxer testified that he checked the registration of the vehicle, and it was registered to Grant at 707 James Street in Canton.

¶5.     Contrary to Grant's statements to Laxer, the evidence introduced at trial showed that the firearm found under Grant's driver's seat had been reported stolen from the 707 James Street address on July 3, 2019, by Grant's mother, Sarah Alexander. While Alexander did not testify at trial, former Canton Police Officer Montreal Thompson testified that he had received the report of the stolen firearm from Alexander, and he testified as to the details she had relayed to him. According to Thompson, Alexander informed him that she worked as a security guard and that the firearm had been assigned to her by her employer for use in the performance of her duties. Thompson testified Alexander had reported that on June 30, 2019, she placed the gun in its case and placed it on a shelf in her residence because she was going out of town. When she returned home, the gun was not in the case.

¶6.     Stephanie Knight, a contract manager for North American Security Inc., testified that Alexander was employed by the company as a security guard. Through Knight's testimony, the State admitted documents into evidence showing that the company had purchased the firearm at issue and assigned it to Alexander for use in performing her duties. Knight testified that the company was notified that the gun had been reported as stolen.

¶7.    After Laxer, Thompson, and Knight's testimony, the State rested its case-in-chief. Grant moved for a directed verdict, which was denied. The defense proceeded with its case-in-chief and called only one witness, Nique Wilson, who was Grant's lifelong friend and next-door neighbor. Wilson testified that Grant got the red Porsche in December of the previous year. On the evening of January 16, 2023, after Wilson got off work he saw the Porsche at Grant's house. According to Wilson, after he cleaned up, he called Grant to see if Grant wanted to go to a Mexican restaurant with him. Grant declined the invitation and told Wilson he was out of town in New Orleans. Since Grant said he was out of town, Wilson asked if he could use Grant's car. Grant agreed, so Wilson went across the street, entered Grant's house, and got the keys. According to Wilson, he went back to his house and grabbed one of his guns and got in the Porche. Wilson testified that before he drove off, he put his gun under the driver's seat. Wilson picked up his uncle, and they went to the restaurant at about 9 p.m. and stayed there until about 10:30 p.m. Grant and Wilson talked again by phone later, and Grant told Wilson to leave the keys in the car when he got back home. According to Wilson, he drove around a bit after they left the restaurant but then went home because he had to go to work the next day. Wilson told the jury he forgot his gun and mistakenly left it in Grant's Porsche.

¶8.    Wilson also testified that the gun he left in the car had been given to him by Grant's mother, Alexander, two or three years earlier. Wilson remembered it was around a holiday because he was helping Alexander get decorations out of her storage room, and he found the gun on top of a box. According to Wilson, Alexander did not look like she wanted the gun,

so he took it. In any event, Wilson testified that he did not tell Grant he had left the gun in his car.

¶9.     On cross-examination, Wilson testified that Grant had lived at 707 James Street with his mother for his whole life, or the majority of his life. Wilson testified he believed Grant was in New Orleans because their call was a FaceTime call, and Grant flipped the camera around to show him he was out of town. Wilson did not know what phone number he called. Wilson testified that Grant was in New Orleans with a female, but Wilson did not know her name. When asked how Grant got to New Orleans, Wilson thought he rode with the female. When he was shown the firearm that was recovered from the Porsche, Wilson said it looked similar to his gun, but he did not know the numbers on the gun. Wilson found out that Grant was in jail but did not tell anyone the gun was his until June 23, 2023, in an affidavit that was prepared by Grant's lawyer. The State showed Wilson a picture from his Facebook page, and Wilson admitted that he had placed the photo on his page. The prosecution suggested that he was flashing gang signs in the picture. Wilson denied that he was in a gang, and as far as he knew, neither was Grant.

¶10.    In rebuttal to Wilson's testimony, the State called MPD Officer Ryan Wigley, who testified as an expert in the area of cellular-device extraction and geolocation. Based upon Wigley's forensic analysis of information extracted from Grant's cell phone, Wigley testified that Grant's cell phone did not leave the Canton, Mississippi area on January 16, the day before Grant's arrest. In fact, Wigley testified that there was no evidence on Grant's phone that shows the phone was in Louisiana at any time.

¶11. The State's next rebuttal witness was MPD Lieutenant John Cooley, who was asked to view the picture Wilson had posted on Facebook of himself. Cooley testified that Wilson's hand signals in the picture indicate that he was representing the People Nation. Cooley testified that the People Nation and the Four Corner Hustlers gangs are now affiliates of the Vice Lords gang. On cross-examination, Cooley confirmed that he does not know Wilson, but Cooley's testimony was that "[Wilson] appeared to be representing the organization with the gang sign."

¶12. The State's last rebuttal witness was Agent Zerial Kitchens, who was employed by the Mississippi Department of Corrections (MDOC) in the Madison County Probation and Parole Office. Kitchens testified that when people come into the custody of MDOC, they are asked questions concerning gang affiliation. Kitchens told the jury that he had reviewed Grant's MDOC records, and Grant had previously identified himself as being affiliated with the Four Corner Hustlers. On cross-examination, Kitchens admitted he did not know when Grant made that representation but said it was probably longer than five years ago.

¶13. The State announced it would finally rest its case. Grant renewed his motion for a directed verdict, which was again denied. The court instructed the jury, counsel gave their closing arguments, and the matter was given to the jury to begin their deliberations. The jury found Grant guilty of possession of a firearm by a felon as charged in Count I and guilty of possession of a stolen firearm as charged in Count II. Grant was sentenced to serve ten years in the custody of MDOC for Count I and to serve five years for Count II. These sentences were ordered to run consecutively. After Grant's post-trial motions were denied, he appealed.

On appeal, Grant challenges the legal sufficiency of the evidence to support his convictions, the admission of evidence related to gang affiliation by Grant and his sole witness, and the admission of expert testimony related to cellphone-location technology.

## STANDARD OF REVIEW

¶14. Our standard of review as to the legal sufficiency of the evidence was stated in *Eubanks v. State*, 341 So. 3d 896, 909-10 (¶41) (Miss. 2022), as follows:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).
>
> > [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.
>
> *Id*. (quoting *Shelton v. State*, 214 So. 3d 250, 256 (¶29) (Miss. 2017)).

In applying this standard, we must also disregard all evidence favorable to the defendant. *See Parish v. State*, 176 So. 3d 781, 786 (¶17) (Miss. 2015); *Moore v. State*, 996 So. 2d 756, 760-61 (¶12) (Miss. 2008); *Withers v. State*, 907 So. 2d 342, 352 (¶29) (Miss. 2005); *White v. State*, 722 So. 2d 1242, 1246 (¶21) (Miss. 1998). The jury determines the credibility of the witnesses and the weight of their testimony. In *Willis v. State*, 300 So. 3d 999, 1007 (¶25) (Miss. 2020), the supreme court wrote:

But "[w]e do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Little* [*v. State*], 233 So. 3d [288,] 289 [(¶1) (Miss. 2017)].

In reaching a similar conclusion, this Court stated in *Lee v. State*, 369 So. 3d 625, 635 (¶26) (Miss. Ct. App. 2023):

"We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the [requisite] elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010).

As for Grant's remaining issues, we review a trial court's admission or exclusion of evidence for an abuse of discretion. *See Smith v. State*, 417 So. 3d 146, 149-50 (¶9) (Miss. 2025).

**ANALYSIS**

¶15.  On appeal, Grant raises four issues, which we address below:

**I.      Was the evidence legally sufficient to support Grant's conviction of possession of a firearm by a felon as charged in Count I?**

¶16.  Grant was indicted for violating Mississippi Code Annotated section 97-37-5(1) (Supp. 2021), which provides in part:

It shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm or any bowie knife, dirk knife, butcher knife, switchblade knife, metallic knuckles, blackjack, or any muffler or silencer for any firearm . . . .

In *Williams v. State*, 285 So. 3d 156, 159-60 (¶¶12-13) (Miss. 2019), the supreme court stated:

The State must prove two elements beyond a reasonable doubt — (1) the defendant possessed a firearm, and (2) the defendant had previously been convicted of a felony crime. . . . "Possession of [contraband] may be actual or constructive, individual or joint." *Dixon v. State*, 953 So. 2d 1108, 1112 (Miss.

8

2007) (citing *Berry v. State*, 652 So. 2d 745, 748 (Miss. 1995)).

¶17.     Grant admits that he was a felon at the time of his arrest. His challenge to his conviction is that the State did not prove that he knowingly possessed the firearm (either actually or constructively) because he was unaware that the firearm was in the car. First, Grant points to the video to show that the firearm was not in plain view when found by Laxer. Grant contends that the video clearly shows that when Laxer found the gun, he was surprised to find that the firearm was there. In further support of his argument, Grant argues that Wilson testified that he left the firearm under the driver's seat of Grant's car the night before Grant was arrested and failed to tell Grant about the gun. Grant contends that the circumstantial evidence of his knowledge of the presence of the firearm was insufficient to support his conviction.

¶18.     In *Walton v. State*, 420 So. 3d 982, 984-85 (¶12) (Miss. Ct. App. 2025), this Court stated:

> "Guilty knowledge may be proved by direct evidence [or] . . . by any surrounding facts or circumstances from which knowledge may be inferred." *Kelly v. State*, 124 So. 3d 717, 720 (¶6) (Miss. Ct. App. 2013); *see also Ratcliff v. State*, 396 So. 3d 1101, 1105 (¶5) (Miss. 2024) (citing *Barton v. State*, 303 So. 3d 698, 703 (¶18) (Miss. 2020); *Johnson v. State*, 224 So. 3d 66, 68 (¶5) (Miss. 2016)), *rev'g*, 404 So. 3d 1180 (Miss. Ct. App. 2023). "In both direct and circumstantial cases, the jury is empowered to weigh, and resolve conflicts in, the evidence." *Dees v. State*, 126 So. 3d 21, 26 (¶19) (Miss. 2013).

Concerning the weight and sufficiency of circumstantial evidence, this Court stated in *Beasley v. State*, 362 So. 3d 112, 123 (¶¶37-38) (Miss. Ct. App. 2023):

> **Mississippi caselaw has a "clear and longstanding position that circumstantial evidence and direct evidence carry the same weight."** *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021); *accord Williams v.*

9

*State*, 305 So. 3d 1122, 1129 (¶17) (Miss. 2020) ("Evidence is either direct or circumstantial. And both types of evidence carry the same weight."); *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984) ("Circumstantial evidence is entitled to the same weight and effect as direct evidence[,] and this Court has upheld convictions based solely on circumstantial evidence."); *Bogard v. State*, 233 So. 2d 102, 105 (Miss. 1970) ("[I]t is pointed out that circumstantial evidence, ordinarily, is entitled to the same effect and weight as direct evidence and may, in the concrete, be the more reliable and stronger." (internal quotation marks omitted)).

Moreover, the Mississippi Supreme Court has repeatedly held, "Direct evidence is unnecessary to support a conviction **so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt**." *Campbell v. State*, 789 So. 2d 524, 528 (¶12) (Miss. 2001).

(Emphasis added) (citations omitted). So long as the evidence, both direct and circumstantial, was sufficient for a rational jury to find beyond a reasonable doubt that Grant knowingly possessed the firearm, Grant's conviction should be affirmed.

¶19. Reviewing the evidence in the light most favorable to the prosecution, we find the following evidence supports the conviction. Grant stipulated that he was a convicted felon at the time of the traffic stop. Grant was the registered owner of the vehicle, the driver of the vehicle, and the sole occupant of the vehicle at the time of the stop. Under these circumstances, there is a rebuttable presumption that Grant was in constructive possession of the firearm. *See McGee v. State*, 422 So. 3d 1011, 1021 (¶39) (Miss. Ct. App. 2025). Further, once the firearm was discovered, but before Grant saw it, he told Laxer that it belonged to his brother. This was circumstantial evidence that he knew the gun was in the vehicle. The fact that this gun was reported stolen by his mother while he was living with her also connects Grant to the weapon.

¶20. The defense attempted to rebut the presumption that Grant knew the gun was in the

vehicle through Wilson's testimony. Wilson's testimony was called into question, first by Grant's own statement to Laxer. Grant told Laxer that the gun belonged to his brother, not Wilson. Wilson's testimony was further impeached by the State's evidence that Grant was in Canton, not New Orleans, the night before the traffic stop. These conflicts called Wilson's entire story into question. In *Owens v. State*, 383 So. 3d 305, 310-11 (¶26) (Miss. 2024), the supreme court stated:

> This Court has repeatedly established an appellate court's review of the jury's role and function. The Court in *Gandy v. State* held that
>
>> Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness. No formula dictates the manner in which jurors resolve conflicting testimony into finding of fact sufficient to support their verdict. That resolution results from the jurors hearing and observing the witnesses as they testify, augmented by the composite reasoning of twelve individuals sworn to return a true verdict. A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution.
>
> *Gandy v. State*, 373 So. 2d 1042, 1045 (Miss. 1979) (citing *Shannon v. State*, 321 So. 2d 1, 2 (Miss. 1975)). Further, the Court in *Bond v. State* wrote that
>
>> In a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witness, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury.
>
> *Bond v. State*, 249 Miss. 352, 162 So. 2d 510, 512 (1964) (citing *Ivey v. State*, 206 Miss. 734, 40 So. 2d 609, 613 (1949)).

A rational jury could reasonably resolve these conflicts and find Wilson's testimony

11

untrustworthy, which this jury obviously did.

¶21. When viewing the evidence in the light most favorable to the prosecution and disregarding any evidence in favor of the defendant, under the standard set forth in *Eubanks*, we find the evidence was legally sufficient to prove the necessary elements of possession of a firearm by a felon.

> **II.** **Was the evidence sufficient to support Grant's conviction of possession of a stolen firearm as charged in Count II?**

¶22. Grant argues on appeal that "the State utterly failed to put on any proof that Grant knew or had reason to know that the firearm was stolen." Grant does not question the proof that the firearm recovered from his vehicle had been reported stolen by his mother. Under this issue, Grant's sole argument is that the State did not prove that he knew the gun found under his driver's seat was his mother's stolen firearm.

¶23. The State argues that the evidence and inferences from the evidence show that the firearm found in Grant's car was his mother's weapon. His mother reported that the gun had been stolen from the residence that she shared with Grant. No one else was living at the residence then. The State contends that the fact that he was in possession of his mother's stolen firearm supports an inference that he knew it was stolen. The State also suggested that it was inconceivable that Grant could have unknowingly possessed his mother's firearm over three years after it was reported stolen. As noted above, Grant also told the officer that the gun was his brother's and that it was "clean." A reasonable inference was that Grant knew the gun was his mother's stolen firearm, and he was trying to deceive the officer into not checking any further.

¶24. In the first issue, we found that the evidence was legally sufficient to prove that Grant was in possession of the firearm found in his vehicle. The sole question before the court as it relates to Count II is whether a reasonable jury could find that Grant knew the weapon was stolen. When we view the evidence outlined above in the light most favorable to the prosecution as required by *Eubanks*, we find, at a minimum, that "reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions" as to whether Grant knew the firearm was stolen. *See Naylor*, 248 So. 3d at 796 (¶8). Therefore, we find the evidence sufficient to support Grant's conviction of Count II.

### III. Did the trial court err by admitting evidence that Grant was affiliated with a gang for purposes of impeachment?

¶25. Prior to the cross-examination of Nique Wilson, the State asked to be heard outside the presence of the jury. The State then informed the trial court that pursuant to Mississippi Rule of Evidence 616, it intended to introduce evidence of Wilson's and Grant's gang affiliation to show Wilson's bias or interest in testifying on Grant's behalf and accepting responsibility for the firearm found in Grant's vehicle. The prosecutor informed the court that the State had a photograph showing Wilson "throwing gang signs" and another photograph of Wilson and Grant together. The State cited *Dao v. State*, 984 So. 2d 352, 361 (Miss. Ct. App. 2007), and *Street v. State*, 754 So. 2d 497, 503 (Miss. Ct. App. 1999), as support for the admission of the evidence under Rule 616.

¶26. The defense argued that the State had not shown a proper foundation for the admission of such evidence and had not identified any witness who could lay a foundation for admissibility. Defense counsel also argued that the probative value of any such testimony or

13

evidence would be substantially outweighed by the danger of unfair prejudice to Grant.

¶27. The State replied that they had a photograph of Wilson flashing a gang sign and an MDOC booking record showing that Grant was affiliated with the Four Corner Hustlers. The prosecutor told the court that based upon the belief that both Wilson and Grant were affiliated with gangs and that they were neighbors, the State believed it would be proper cross-examination of Wilson for impeachment purposes. When the court asked about any witness the State intended to call to testify, the State indicated that if Wilson denied they were affiliated with gangs, then the State would call a narcotics investigator. The court ruled that the State could question Wilson as to "possible bias or motive under Rule 616 in accordance with *Dao v. State* and *Street v. State*." The court found that "the danger of unfair prejudice is minimal and the probative value as to potential bias is high. For that reason, the [c]ourt would say that it passes through the filter of 403."

¶28. As noted above, the photos were admitted into evidence. Wilson denied that he was affiliated with any gang, and to his knowledge, neither was Grant. In rebuttal, as set forth above, Cooley was called and testified that Wilson appeared to be "representing" the People Nation by the hand signal he was using in the picture. On cross-examination, Cooley admitted that he did not know Wilson but that his picture showed him to be representing the People Nation.

¶29. After Cooley's testimony, the State's counsel approached the bench outside the hearing of the jury and advised the court that the State intended to call Kitchens to testify about the MDOC record showing Grant had identified himself as belonging to the Four

14

Corner Hustlers. The defense objected to the State producing a booking sheet to show that Grant was gang-affiliated. Again, the court found such evidence to be admissible pursuant to Rule 616 and that it should not be excluded pursuant to Rule 403.

¶30. Kitchens was then called and testified as set out above. When Kitchens began to testify about the MDOC booking record, the defense objected and argued that the booking sheet should not be admitted because the State had not met the requirements of Mississippi Rule of Evidence 803(6) and that the record had not been properly authenticated. The State then announced that it did not intend to introduce the record into evidence. The examination of the witness continued, and based upon the record, Kitchens testified without objection that Grant was affiliated with the Four Corner Hustlers.[2]

¶31. On appeal, Grant does not specifically address any error as to Cooley's testimony concerning Wilson's hand signals. Instead, his argument under this issue is directed to Kitchens' testimony from the booking sheet that was not authenticated and was not offered into evidence. Grant recognizes that this challenge must be considered under a plain error analysis since there was not a specific objection at trial to Kitchens' testimony as to what he had seen in the records.

¶32. We find, pursuant to Rule 616, *Dao,* and *Street*, it was permissible for the State to question Wilson about his and Grant's possible gang affiliations. We also find that pursuant to those same authorities, as well as Rule 608, it was not error to allow Cooley's testimony

---

[2] The trial court gave a proper, contemporaneous, limiting instruction when the mention of gang activity arose during the testimony of Wilson, Cooley, and Kitchens. Grant has not raised any issue on appeal related to the propriety of the limiting instruction.

to impeach Wilson's denial of his affiliation with any gang.

¶33. As to Kitchens' testimony from records he did not prepare, and which had not been properly authenticated, Grant requests that we conduct a plain error analysis since he failed to preserve the issue at trial. Concerning such an analysis, the supreme court stated in *Pegues v. State*, 426 So. 3d 1078, 1083 (¶22) (Miss. 2026):

> The plain-error doctrine allows the Court "to correct 'obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right.'" *Wilson v. State*, 194 So. 3d 855, 863 (¶25) (Miss. 2016) (quoting *Johnson v. State*, 155 So. 3d 733, 738 [(¶8)] (Miss. 2014)). "For the plain-error doctrine to apply, there must have been an error that resulted in manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted) (quoting *Johnson*, 155 So. 3d at 738).

Thus, applying plain error review, the question is whether the admission of Kitchens' testimony resulted in a "manifest miscarriage of justice" in this case.

¶34. During the testimony of Wilson, Cooley, and Kitchens, the court gave a contemporaneous oral instruction and gave a written jury instruction at the conclusion of the case, explaining to the jury that testimony concerning gang affiliations was admissible only to show a possible bias or motive for Wilson's testimony and could not be used as proof that Grant committed the crimes charged in this case. We must presume that the jury followed the court's instructions. *Brown v. State*, 407 So. 3d 239, 247 (¶21) (Miss. Ct. App. 2024). Because we find that any unfair prejudice was cured by the court's instruction, the trial court did not commit plain error by the admission of Kitchens' testimony.

**IV.    Did the trial court err by admitting expert testimony regarding cellphone-location technology?**

16

¶35.    Grant contends that he was not given notice that Wigley would testify as an expert witness. Citing *Wright v. R.M. Smith Investments L.P.*, 210 So. 3d 555, 558 (¶8) (Miss. Ct. App. 2016), Grant further argues that Wigley was not qualified to testify as an expert because the State failed to offer any evidence pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to support Wigley's testifying as an expert.

¶36.    The State argues on appeal that Grant is procedurally barred from raising the issue of the State's failure to give the defense notice that Wigley would be called to testify as an expert witness because Grant did not raise the issue at trial. *See Walker v. State*, 913 So. 2d 198, 217 (¶49) (Miss. 2005). Even if we assume for the sake of argument that the State committed a discovery violation by failing to designate Wigley as an expert prior to trial, because Grant failed to request a continuance to prepare to rebut the expert testimony, this issue is barred from review on appeal. *See Moffite v. State*, 309 So. 3d 529, 538 (¶41) (Miss. Ct. App. 2019).

¶37.    In any event, the bulk of Grant's argument under this issue is his contention that Wigley was not qualified to testify as an expert. When the defense pointed out that Wigley had not been offered or qualified as an expert by the State, the trial court gave the State an opportunity to lay the foundation for Wigley to be qualified as an expert. In *Thomas v. Shed 53 LLC*, 331 So. 3d 66, 73-74 (¶25) (Miss. Ct. App. 2021), this Court stated:

> Admission of expert testimony is governed by Rule 702 of the Mississippi Rule of Evidence, which provides:
>
>> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or

other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"[F]or expert testimony to be admissible, it must be both relevant and reliable"; that is, "the testimony must be capable of being applied to the facts at issue" and "scientifically valid." *Thompson v. Holliman*, 283 So. 3d 718, 722 (¶16) (Miss. 2019) (citing *Daubert*, 509 U.S. at 592; [*Tunica County v.*] *Matthews*, 926 So. 2d [209,] 213 (¶6) [(Miss. 2006)] (citing [*Miss. Transp. Comm'n v.*]*McLemore*, 863 So. 2d [31,] 36 (¶11) [(Miss. 2003)]). "The party offering the testimony must show that the expert based his opinion not on opinions or speculation, but rather on scientific methods and procedures." *Matthews*, 926 So. 2d at 213 (¶6). In examining the reliability of an expert's opinions and methods, the trial court must look at factors, including

whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 37 (¶13) (citing *Daubert*, 509 U.S. at 592-94).

¶38. Although Wigley had already testified about his training and experience with the software and hardware he used to perform the extraction from Grant's phone and to produce the reports he would explain in his testimony, the State went back through Wigley's training and experience. Wigley testified that he had over ninety hours of training in cellular-device extraction and geolocation. This training was conducted by the Secret Service, Cellebrite (whose products Wigley used), and GrayKey (whose products Wigley used). Wigley testified that the equipment he uses costs $60,000 to $80,000 per year to keep current and that he is

certified to operate the equipment and software. He has met continuing education requirements to maintain his certifications. He told the court he has been performing extractions for over ten years (first working with the Cellebrite products in 2013) and has performed over one thousand phone extractions. He testified that he performs over one hundred extractions every year and that the number is steadily increasing. He stated that he had previously testified in the Circuit Court of Madison County as to the results of his extractions of cellular devices.

¶39. Grant's counsel was given an opportunity to voir dire Wigley as to his qualifications. Wigley again went over his training and experience. He told the jury that there are several principles and methods used to extract data. Some devices require modifications to his system's settings. Wigley explained that the software and hardware he uses can extract data from most devices without having the password for the device. However, he explained that there are some devices that his software and hardware cannot "crack," and as a result, he cannot perform an extraction on those devices without the owner's password. He explained that the extraction process can be quick or can take over a year to complete, depending on the device.

¶40. The State tendered Wigley as an expert, and Grant's counsel objected, stating only:

> I do lodge an objection based upon the fact of 702, Rule 702 of the Mississippi Rules of Evidence, Your Honor.

The trial court ruled:

> The [c]ourt finds the expert's technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. The [c]ourt will accept the witness as an expert in the area of cellular device

extraction and geolocation.

¶41. Grant's argument on appeal is somewhat different than the objection raised at trial. He now focuses on the fact that the State's questions did not specifically address the *Daubert* factors. In response to a similar argument in *Bateman v. State*, 125 So. 3d 616, 626-27 (¶32) (Miss. 2013), the supreme court stated:

> Bateman argues that Dr. Matherne's testimony met none of the principles for reliability set out in *Daubert*.[3] However, this Court already has addressed this exact issue and found no error in the trial court's allowing Dr. Matherne's testimony, irrespective of total compliance with *Daubert*. See *Anderson*, 62 So. 3d at 939. This Court has held that failure to meet the *Daubert* principles does not automatically render an expert's testimony inadmissible. *Poole ex rel. Wrongful Death Beneficiaries of Poole v. Avara*, 908 So. 2d 716, 723 (Miss. 2005). *Daubert's* list of factors is meant to be illustrative, but not exhaustive, and the factors; applicability depends on "the nature of the issue, the expert's particular expertise, and the subject of the testimony." *McLemore*, 863 So. 2d at 37 (citing *Kumho Tire*, 526 U.S. at 137, 119 S.Ct. 1167). "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Bateman takes particular issue with the fact that Dr. Matherne's use of the "fist demonstration" has not been published or peer-reviewed. Yet, as the United States Supreme Court in *Kumho Tire* reasoned, "It might not be surprising in a particular case ... that a claim made by a scientific witness has never been subject to peer review." *Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167.

¶42. Concerning appellate review of a trial court's admission of expert testimony, our supreme court stated in *Anderson v. State*, 62 So. 3d 927, 936 (¶23) (Miss. 2011):

[3] Footnote 3 in *Bateman* stated:

> The principles of reliability set out in Daubert are: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-594, 113 S.Ct. 2786.

The admission of expert testimony is within the sound discretion of the trial judge. *Bishop v. State*, 982 So. 2d 371, 380 (Miss. 2008) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss.2003)). This Court will not reverse a trial court's decision to admit expert testimony unless it finds that the trial court's decision "was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Id*. (citations omitted).

And in *Clark v. State*, 315 So. 3d 987, 996 (¶20) (Miss. 2021), the supreme court held:

[M]agic words are not required under the *Daubert* standard or elsewhere. *Jones v. State*, 920 So. 2d 465, 476 (Miss. 2006) ("magic words" not necessary in the context of Rule 403). The trial judge clearly found the testimony admissible both by acknowledging the availability to the defense of cross-examination and by, of course, allowing the testimony in the trial. The judge's duty is to perform the gatekeeper function and to leave for us a record sufficient to allow us to determine that the function was performed and supported by the record submitted. We have before us the record, and it is sufficient for us to determine whether the trial judge abused his discretion.

Based upon the record in this case, we find that the trial court did not abuse its discretion in allowing Wigley to testify as an expert in the area of cellular-device extraction and geolocation.[4]

## CONCLUSION

¶43.    Finding no reversible error, we affirm Grant's convictions and sentences.

¶44.    **AFFIRMED.**

---

[4] Although not raised by either party, we note that the United States Court of Appeals for the Fifth Circuit has ruled that expert testimony is not needed to authenticate information retrieved from a phone using Cellebrite, concluding in *United States v. Williams*, 83 F.4th 994, 998 (5th Cir. 2023):

Operating a Cellebrite device and understanding its report require knowledge in the realm of a reasonably tech-savvy lay person, regardless of the investigator's testimony that he was a "certified" operator and analyzer.

We recognize that in the case at bar, Wigley used multiple products to generate the information he communicated to the jury.

**CARLTON AND WILSON, P.JJ., LAWRENCE, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND McDONALD, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45.    I agree that there was sufficient evidence to support Grant's conviction of possession of a firearm by a felon. I also agree with the majority's resolution of Grant's evidentiary claims. However, I am not persuaded that there was sufficient evidence to support Grant's conviction of possession of a stolen firearm. Accordingly, I must respectfully dissent from that aspect of the majority's decision.

¶46.    As the majority notes, Officer Laxer stopped Grant because of the way that Grant's temporary paper license plate was displayed. Laxer told Grant that he smelled marijuana, but he never found any. Instead, he found a substantial amount of money in Grant's pocket and a pistol under Grant's seat. Through Officer Thompson, the prosecution introduced evidence that Grant's mother had reported the pistol as stolen approximately three-and-a-half years earlier. Grant asserts that the State did not adequately prove that he knew the pistol had been stolen.

¶47.    "It is unlawful for any person knowingly or intentionally to possess, receive, retain, acquire or obtain possession . . . of a stolen firearm . . . ." Miss. Code Ann. § 97-37-35(1) (Rev. 2020). "Guilty knowledge is the gist of the offense of . . . possession of a stolen firearm." *Barton v. State*, 303 So. 3d 698, 701 (¶14) (Miss. 2020). To demonstrate guilty knowledge, the State must present evidence that the accused "received the [firearm] under

22

circumstances that would lead a reasonable person to believe it was stolen." *Id*. Circumstantial evidence may be sufficient. *Id*. But it must show "beyond a reasonable doubt that the accused knew the [firearm] had been stolen . . . ." *Id*. at 702 (¶16). "[M]ere supposition or suspicion as to his knowledge will not suffice." *Id*. Similarly, it is not enough to merely establish that the accused possessed a firearm that had been stolen. *Id*. Furthermore, "this Court must consider *all of the evidence*—not just the evidence which supports the case for the prosecution[.]" *Thomas v. State*, 48 So. 3d 460, 467 (¶13) (Miss. 2010) (emphasis added) (internal quotation marks omitted); *see also Jackson v. State*, 580 So. 2d 1217, 1219 (Miss. 1991) ("The standard of appellate review requires the Court to consider all the evidence, not just that supporting the case for the prosecution . . . .").

¶48.    Through Knight, the State presented evidence that North American Security Inc. bought the pistol and issued it to Alexander. The State also demonstrated that in July 2019, Alexander reported that the pistol had been stolen from her home. Finally, the State presented evidence that during a traffic stop in January 2023, Laxer found the pistol under Grant's seat. Aside from Wilson's testimony that he accidentally left the pistol in Grant's car during the evening of January 16, 2023, there was no evidence regarding how or when Grant may have come to possess the pistol or how he would know it was stolen.

¶49.    When there is only circumstantial evidence that an accused knew or should have known that a firearm had been stolen, the State also has to present evidence that "exclud[es] . . . every reasonable hypothesis with his innocence." *Id*. at 703 (¶18). In *Barton*, there was no evidence regarding how the accused in that case "came to possess" a stolen

23

firearm, and there was no evidence that he "possessed recently stolen property." *Id*. at (¶19). The accused's efforts to hide the pistol were not enough to satisfy the requisite burden because it was equally plausible that he hid it due to his status as a felon. *Id*.; *see also Ratcliff v. State*, 396 So. 3d 1101, 1107 (¶11) (Miss. 2024).[5]

¶50.    In its supplemental brief, the State relies heavily on the premise that Grant must have known that Alexander had reported the pistol as stolen approximately three and a half years before Laxer found it under Grant's seat. Without question, the circumstances were certainly *suspicious*. But the State's theory hinges on the unproven concept that Grant knew everything that Alexander did simply because they *may have* lived in the same house when Alexander reported that the pistol had been stolen years earlier. One naturally supposes that Grant may have known that his mother had filed a report with the Canton Police Department. One also *suspects* that if Grant somehow encountered the pistol after his mother filed the report, then he may have been able to identify it by its serial number or otherwise. But as previously noted, "mere supposition or suspicion as to [an accused's] knowledge [that a firearm had been stolen] will not suffice." *Barton*, 303 So. 3d at 702 (¶16).

¶51.    And since the State was only able to present circumstantial evidence that Grant knew the pistol had been stolen, his conviction of possession of a stolen firearm can only stand if the evidence "exclude[d] every reasonable hypothesis consistent with [Grant's] innocence."

_____

[5] Our Supreme Court handed down the opinion in *Ratcliff* after briefing ended in this case.  Chief Justice Randolph did not participate in the decision, but it was otherwise unanimous.  On our own motion, we directed the parties to submit supplemental briefs discussing whether "[i]n light of the Mississippi Supreme Court's decision in *Ratcliff*" there is sufficient evidence to support Grant's conviction for possession of a stolen firearm.

*Id*. at 703 (¶18). I do not suggest that there is a heightened standard of proof in circumstantial-evidence cases. Indeed, "the jury should consider and weigh *all* of the evidence presented. And if the jury is convinced beyond a reasonable doubt, we can require no more." *Adame v. State*, 401 So. 3d 204, 210 (¶36) (Miss. Ct. App. 2025) (internal quotation marks omitted) (quoting *Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021)). In *Nevels*, 325 So. 3d at 634 (¶20), our Supreme Court held that a jury should not be given a special circumstantial-evidence instruction.[6] Even so, the Supreme Court decided *Ratcliff* approximately three years after *Nevels*, and the Supreme Court still applied the "crucial" principle that circumstantial evidence must exclude every hypothesis consistent with innocence to sustain a conviction. *Ratcliff*, 396 So. 3d at 1105 (¶5).[7] Thus, *Ratcliff* makes it clear that our high court has not nullified this principle.

¶52.     As previously noted, we are required to give the State "the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Garrett*, 344 So. 3d at 851 (¶12). However, "[w]henever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed." *United States v. Ross*, 92 U.S. 281, 284 (1875). In other words, evidence may not be conjured from thin air by piling inferences upon presumptions. Even viewed in the appropriate light, since there was no

---

[6]  Grant did not request a circumstantial-evidence instruction, so the issue in *Nevels* is not present in this case.

[7]  Unlike *Nevels*, *Ratcliff* did not involve an issue related to the circuit court's decision to refuse a circumstantial-evidence instruction. *Ratcliff*, 396 So. 3d at 1104 (¶3) ("Ratcliff raises a single issue in his petition for certiorari: whether the Court of Appeals erred by finding that sufficient evidence supported his conviction for possession of a stolen firearm.").

evidence regarding how or when Grant may have initially come to possess the pistol—much less that he actually stole it from his mother—I am unable to conclude that the State satisfied its burden. There was no evidence that Grant actively attempted to conceal the pistol when Laxer stopped him, only that it was under Grant's seat. If its presence under the seat can be interpreted as concealment, even that is not sufficient. And it is noteworthy that Grant owned two cell phones and that the prosecution was unable to present any evidence regarding the location of Grant's second cell phone during the night before Laxer pulled him over. Because the circumstantial evidence in this case does not exclude every hypothesis consistent with a conclusion that Grant was not guilty of knowingly possessing a stolen firearm, I would reverse that conviction and render a judgment of acquittal as to that charge.

**BARNES, C.J., AND McDONALD, J., JOIN THIS OPINION.**